UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SYLVESTER MOORE,

    Plaintiff,

v.

M. MAGAT, et al.,

    Defendants.

Case No. 14-cv-03608-HSG (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 47

On August 8, 2014, plaintiff filed the above-titled *pro se* civil rights action under 42 U.S.C. § 1983 against medical staff at Santa Rita Jail and the Glenn E. Dyer Detention Facility, where he was housed as a federal pre-trial detainee. Specifically, plaintiff claims defendants improperly treated a facial fracture he sustained during an altercation with other inmates. Defendants are all medical personnel employed by Corizon Health, Inc. ("Corizon"), the entity contracted to provide medical care for inmates in the Alameda County jails. Per order filed November 24, 2014, the Court found that, liberally construed, plaintiff's allegations stated a cognizable Eighth Amendment claim for deliberate indifference to serious medical needs.

Now before the Court is defendants' motion for summary judgment. Plaintiff has filed an opposition, and defendants have filed a reply.

## FACTUAL BACKGROUND[1]

**A.  Plaintiff's February 12, 2014 Altercation and Treatment**

Plaintiff has been in federal custody on robbery and racketeering-related charges. Pl.'s Depo., Ho Decl. Ex. A, at 47:15-20, 51:8-11. During a February 12, 2014 altercation with other inmates at the Federal Correctional Institution in Dublin ("FCI"), Plaintiff sustained a zygomatic arch (cheek) fracture. Compl. at 8.[2]

---

[1] The following facts, unless otherwise noted, are undisputed.

[2] Page number citations for Plaintiff's filings refer to those assigned by the Court's electronic filing system and are located at the top right hand corner of each page.

1  He received treatment at ValleyCare Medical Center ("ValleyCare") and was discharged that same evening. Discharge papers indicated Plaintiff had a closed facial fracture, was in "good" condition, and was to follow up with a primary care provider in one to two days "for re-evaluation and further treatment." A physician recommended Norco to be taken for pain, as needed. Magat Decl. Ex. 1 at 11.

The following day (February 13), an FCI nurse practitioner evaluated Plaintiff and prescribed Tylenol 3 (i.e., Tylenol with codeine). Pl.'s Depo. at 96:22-97:17.

### B. Plaintiff's February 14, 2014 Transfer to Santa Rita Jail

On February 14, 2014, Plaintiff was transferred to Alameda County's Santa Rita Jail ("SRJ"). Compl. at 7. Upon arrival, he told a nurse about his recent injury and hospital care. *Id.* at 7-8. The nurse consulted Defendant Maria Magat, M.D., who determined Plaintiff would not be admitted into custody without confirmation he had received hospital care for his injuries. *Id.* at 9-10; Magat Decl., ¶3. Following receipt of confirmation of clearance from ValleyCare, Plaintiff was admitted to SRJ. Magat Decl., ¶3.

Later that evening, Defendant Corazon Beltran, R.N., completed an intake medical assessment. Compl. at 14. Plaintiff reported the facial fracture and complained of related pain, but was alert, oriented and in no acute distress, despite not having had any medication since that morning. *Id.*; Beltran Decl., ¶3; Pl.'s Depo. at 102:24-25; 132:21-134:11.

Ms. Beltran reviewed the ValleyCare discharge papers and consulted telephonically with the on-call physician (Defendant Lane Melgarejo, M.D.). Dr. Melgarejo ordered Norco to be taken for three days and ordered an expedited follow-up evaluation. Compl. at 14-15; Beltran Decl., ¶¶5-7; Melgarejo Decl., ¶6. Ms. Beltran administered a Norco, and scheduled the follow-up. She indicated in the appointment note that the doctor had started the patient on Norco for three days and had ordered the patient's return to the clinic for further fracture evaluation. Beltran Decl., ¶6. Plaintiff did not object to Dr. Melgarejo's orders or request more medication or more urgent care. *Id.* Ms. Beltran designated Plaintiff a "2" on his intake form to help ensure a prompt follow-up. *Id.*, ¶7; Magat Decl. Ex. 1 at 13.

Ms. Beltran explained to Plaintiff the process for requesting care by submitting a medical

2

1  request slip. Beltran Decl., ¶9. On February 18, 2014, Plaintiff submitted a medical request slip

2  indicating his Norco prescription had expired and seeking renewal. Pl.'s Depo., 172:5-7; Magat

3  Decl. Ex. 1 at 122.

### C. Plaintiff's Fracture-Related Care and Treatment

On February 24, 2014, Defendant Maria Sadri, R.N., assessed Plaintiff. Sadri Decl., ¶4. The parties dispute the reason for the ten-day delay between Plaintiff's first medical assessment at SRJ on February 14 and his follow-up appointment on February 24. Specifically, Defendants assert that they scheduled appointments to see Plaintiff on February 17, February 19, and February 21, but that Plaintiff was off-site for attorney meetings or court appearances on each occasion. Mot. Summ. J. at 4; Magat Decl. Ex. 1 at 131.[3] Plaintiff asserts, however, that he never had any off-site meetings or court appearances from February 14, 2014 to February 22, 2014. Pl.'s Decl., Dkt. 58, at 2-3.

In any event, at the February 24, 2014 medical appointment, Plaintiff was alert and oriented. Sadri Decl., ¶4. According to Plaintiff, he communicated to Ms. Sadri that he was in the worst pain of his whole life. Compl. at 18. According to Ms. Sadri, Plaintiff exhibited no signs of acute distress, and no objective indication of pain was evident. Sadri Decl., ¶¶ 4-5. He requested Claritin and Norco. *Id.* Ms. Sadri was not licensed to prescribe medication. *Id.*, ¶ 4. She therefore arranged for a nurse practitioner to evaluate Plaintiff during the next available appointment to assess his request for narcotics. *Id.*, ¶6.

On February 26, 2014, Defendant Nurse Practitioner Spring Cerise evaluated Plaintiff. Cerise Decl., ¶3; Magat Decl. Ex. 1 at 35. Plaintiff referenced the February 12 fracture and said that, at ValleyCare, he had received x-rays and had been told he would need surgery. *Id.* Plaintiff was calm and in no acute distress. Cerise Decl., ¶4. Ms. Cerise examined his head, eyes, ears, nose and throat, finding nothing remarkable. *Id.* No signs of trauma, bruising, discoloration, deformity, or swelling were evident in the cheek area where Plaintiff indicated he had been injured. *Id.* Nonetheless, anticipating a possible referral for specialist evaluation, she ordered

---

[3] Plaintiff's medical records indicate that the first attempted appointment was scheduled for February 15, not February 17. *See* Magat Decl. Ex. 1 at 131.

facial x-rays and obtained Plaintiff's consent to request records from ValleyCare. *Id.* She also prescribed Norco. *Id.*

On March 4, 2014, Ms. Cerise learned from ValleyCare that it had no record of Plaintiff's care. *Id.*, ¶13. That same day, she also received results of a right orbital x-ray, which showed no injury. *Id.* She scheduled an appointment to confer with Plaintiff about the results, his care, and about ValleyCare's indication that they had no records. *Id.* On March 7, Ms. Cerise received additional x-ray results describing the fracture as a comminuted right zygomatic arch fracture with a mild to moderate medial depression of the central portion. *Id.*, ¶14. That same day, Ms. Cerise submitted a referral request for evaluation in the Highland Hospital oral-maxillofacial surgery clinic ("OMFS"). *Id.*[4]

On March 11, 2014, OMFS confirmed an appointment for the following day. During his March 12 OMFS appointment, Plaintiff complained of pain, but denied any jaw locking. His mouth opening and jaw movement were within normal range, with no functional deficit. The OMFS provider ultimately decided that surgical intervention was not indicated. He advised Plaintiff that treatment for cosmetic reasons could be considered in the future. Connelly Decl., ¶13; Magat Decl. Ex. 1 at 33; Cerise Decl., ¶19.

On March 20, 2014 Ms. Cerise again evaluated Plaintiff, who complained of pain when biting down and requested more pain medication and a soft diet. No sign of acute distress was evident. Ms. Cerise nonetheless increased the Norco prescription from two times a day to three. Cerise Decl., ¶18; Magat Decl. Ex. 1 at 32.

On March 25, 2014, Ms. Cerise, concerned about the reported biting-related pain, and not having received a progress note from OMFS, called OMFS and spoke with a Dr. Eckard. Dr. Eckard explained surgery was not recommended as it would only be cosmetic and entailed significant risk of facial nerve palsy. Cerise Decl., ¶19; Magat Decl. Ex. 1 at 31. On March 26, 2014, Ms. Cerise received Dr. Eckard's progress note and spoke with him again. Dr. Eckard

---

[4] Ms. Cerise's progress notes indicate that she later followed up with ValleyCare and, on March 21, 2014, they finally located their records of Plaintiff's February 12 emergency treatment there. Magat Decl. Ex. 1 at 31-32.

4

stated the complaint of pain when biting down was consistent with a healing fracture and recommended a soft diet for one to two weeks. Cerise Decl., ¶20; Magat Decl. Ex. 1 at 30. He expected the pain to resolve with healing. *Id.* Ms. Cerise ordered a soft diet for 14 days. *Id.*; Magat Decl. Ex. 1 at 119. She also requested further OMFS follow-up to specifically address the complaint of jaw pain. Cerise Decl., ¶20.

On March 27, 2014, Ms. Cerise again evaluated Plaintiff. He complained of pain that was exacerbated by lying on his right side. Ms. Cerise told him about the further OMFS follow-up, ordered Neurontin (300 mg, twice a day) and amitriptyline (25 mg at bedtime). She also authorized an extra blanket for cushioning Plaintiff's face while he slept. Cerise Decl., ¶21; Magat Decl. Ex. 1 at 29.

On April 3, 2014, Ms. Cerise again evaluated Plaintiff. He was in no acute distress, but he complained of continued pain when biting down and on the right side at night. He requested increased pain medication at night, and Neurontin for daytime pain. Ms. Cerise ordered Norco (5/325 mg, two tablets at bedtime for 2 weeks) and a liquid nutritional supplement to augment the soft diet. Plaintiff continued receiving Neurontin and amitriptyline. Cerise Decl., ¶23; Magat Decl. Ex. 1 at 28.

On April 10, 2014, Plaintiff was transferred to Alameda County's Glenn E. Dyer Detention Facility ("Glen Dyer") for what Plaintiff characterized as "safety purposes." Pl.'s Depo., 59:1-4; Magat Decl. Ex. 1 at 123. The following day (April 11), Dr. Sing Tan evaluated Plaintiff, noting complaints of right cheek pain. However, Plaintiff exhibited no signs of acute pain, and his cheek was non-tender, not swollen, and appeared symmetrical. Plaintiff reported that his medications and exercise ameliorated pain. Dr. Tan recommended continued regular exercise. Magat Decl. Ex. 1 at 25.

On April 28, 2014, Brenda McCoy, M.D., ordered liquid nutritional supplements twice a day for 60 days, which Plaintiff received until June 28, 2014. Magat Decl. Ex. 1 at 61.

**D.  Plaintiff's Myofascial/TMJ Pain Treatment**

On April 30, 2014, Plaintiff returned to OMFS and was diagnosed with myofascial pain. The physician recommended conservative treatment, including self-massage, moist heat, a soft

1   diet, and acetaminophen (i.e., Tylenol) as needed.  Magat Decl. Ex. 1 at 114.

2   That same afternoon, Plaintiff was evaluated in the dental clinic regarding
3   temporomandibular joint ("TMJ") pain.  Plaintiff reported that OMFS was "unable to help."  He
4   requested ongoing liquid nutritional supplements and pain medication.  He continued to receive
5   Neurontin twice a day, amitriptyline at bedtime, and Norco at night.  Magat Decl. Ex. 1 at 128.

6   During May 2014, Defendant Jose Aramburo, M.D., was advised that Plaintiff was
7   protesting his zygomatic arch fracture treatment.  Aramburo Decl., ¶3.  He evaluated Plaintiff at
8   Glen Dyer on May 21 with the primary goal of identifying any lingering possible fracture-related
9   complications. *Id.*  According to Plaintiff, the evaluation lasted somewhere between 30 seconds
10  and two minutes because Plaintiff ended the appointment after finding Dr. Aramburo to be
11  confrontational.  Compl. at 32; Pl.'s Depo., 80:18-23, 217:5-6.  Dr. Aramburo nonetheless had
12  enough time to obtain Plaintiff's subjective complaint of facial fracture-related pain.  When asked
13  to show where the pain was, Plaintiff pointed to a different location: his TMJ.  Aramburo Decl.,
14  ¶3.  Plaintiff appeared to deeply palpate the area, giving no indication that the area was tender as
15  he did so.  *Id.*  A zygomatic arch fracture generally would not cause the TMJ pain Plaintiff
16  referenced.  *Id.*, ¶4; Magat Decl. Ex. 1 at 23.  Dr. Aramburo ordered an x-ray of the fracture site to
17  further assess its status.  To address Plaintiff's complaint of pain, Dr. Aramburo ordered Tylenol 3
18  for ten days.  He also reviewed the OMFS March 12 records, which showed no further
19  intervention was indicated for the fracture.  Dr. Aramburo subsequently received results of the x-
20  ray he had ordered, which confirmed a healing right zygomatic arch fracture, with no other
21  problematic findings.  He therefore determined no further zygomatic arch care was indicated.  *Id.*,
22  ¶5.

23                                  **DISCUSSION**

24  **A.    Standard of Review**

25  Summary judgment is proper where the pleadings, discovery and affidavits show there is
26  "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
27  law."  *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.
28  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)). The nonmoving party must show more than "the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby,* 477 U.S. at 252). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A district court may only consider admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

Here, Plaintiff has verified his complaint and his declaration in opposition to Defendants' motion for summary judgment by signing the documents under penalty of perjury, and, for purposes of the instant order, the Court construes those documents as affidavits in opposition to Defendants' motion. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & n.10 (9th Cir. 1995) (finding complaint signed under penalty of perjury constituted admissible evidence).

## B.     Deliberate Indifference to Serious Medical Needs

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). The "existence of chronic and substantial pain [is an] . . . indication[] that a prisoner has a 'serious' need for medical treatment." *Id.* at 1060.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). Mere negligence, or even gross negligence, is not enough. *Farmer*, 511 U.S. at 835–36 & n.4.

A showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1058–60 (9th Cir. 2004); *Sanchez v. Vild*, 891

F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctor chose was medically unacceptable under the circumstances and that he chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

**C.    Analysis**

The Court assumes for purposes of this motion that Plaintiff satisfies the first prong of the deliberate indifference analysis, i.e., that there was indeed a "serious medical need." Plaintiff's claim nonetheless fails because there is no evidence showing deliberate indifference or from which deliberate indifference could be inferred. Assuming that Plaintiff had a serious medical condition, there is an absence of evidence that Defendants knew that Plaintiff faced a substantial risk of harm and consciously disregarded it by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837.

Instead the undisputed facts amply demonstrate that Defendants provided Plaintiff with adequate care. Plaintiff was examined and provided with pain medication on the day he arrived at SRJ, February 14, 2014. Between then and May 21, 2014, he was treated by Corizon medical staff on at least seven occasions for his cheek fracture and related pain. *See* Magat Decl, Ex. 1 at 131-32. In addition, as discussed above, he was seen by an outside oral-maxillofacial specialist on two occasions and he received x-rays of the fracture site on two occasions, not including the x-rays he had already received at ValleyCare immediately following the injury. Defendants, as well as outside physicians, examined Plaintiff on multiple occasions and provided him treatment according to his clinical presentation, including pain medication, x-rays, specialist referral, soft diet, nutritional supplements, an extra blanket, and instructions for self-massage and moist heat.

It appears Plaintiff bases his medical indifference claim on the following two arguments: (1) Defendants failed to schedule the follow-up care recommended by ValleyCare; and (2) Plaintiff endured long stretches of time without pain medication. The Court addresses these arguments in turn.

### 1. Follow-Up Care

Plaintiff's primary argument is that he should have been seen by a specialist sooner so that he could have received surgery before the bones healed themselves. He argues that ValleyCare discharge instructions so indicated. Pl's Opp'n, Dkt. No. 57, at 1-2. However, a review of the ValleyCare records shows that Plaintiff was given the following discharge instructions specific to his care:

> Discharge: Discharge from Emergency Department. The patient is discharged to home. Patient's condition is good. The patient is to follow-up with Primary Care Physician in 1-2 days. Purpose of referral: for re-evaluation and further treatment.

Magat Decl. Ex. 1, at 11. Plaintiff's medical care upon arrival at SRJ complied with these instructions.

Plaintiff relies heavily on the following language in his discharge papers:

> Make sure that you follow up as recommended so that a specialist can re-evaluate you and determine whether or not anything further needs to be done about your broken bone. . . . Early follow up with a specialist is important to determine the best course of treatment before the broken bones begin to heal themselves.

Magat Decl. Ex. 1, at 8. These instructions are included in what appear to be ValleyCare's generic instructions provided to all facial fracture patients, as opposed to instructions specific to Plaintiff, as is clear from the language "patient is discharged to home." *Id.* at 11. Further, they do not purport to evince the standard of care. To the contrary, the ValleyCare aftercare instructions state that they represent "the best possible safeguard against complications." *Id.* at 10. In any event, these recommendations were consistent with Plaintiff's treatment. The undisputed facts show that Plaintiff did see a specialist on March 12, 2014 and that the specialist specifically advised against surgery. Plaintiff argues that by the time he finally saw a specialist, it was too late to receive surgery because the bones had healed themselves. However, Defendants have submitted the expert declaration of Dr. Stephen Connelly who concluded, after his review of the records, that: (1) surgery was never medically indicated; and (2) even assuming it had been medically indicated, it would have remained available for four to eight weeks post-fracture. Connelly Decl., ¶¶ 29-32. Plaintiff has failed to come forward with specific facts to support any findings to the contrary. There is no evidence indicating Plaintiff's condition was in any manner worsened as a result of his

waiting to see a specialist, let alone that the wait was the result of deliberate indifference to his condition.[5]

Plaintiff makes much of the fact that he filed an inmate grievance regarding his medical care, a grievance that was affirmed following review by Alameda County quality assurance officer Dr. Calvin B. Benton. *See* Pl.'s Decl., Dkt. 58, Ex. 3. Specifically, Dr. Benton stated in his response to Plaintiff's grievance:

> The inmate informed the personnel in ITR that he has sustained facial fracture. In my opinion the inmate should have been seen the day after his admission and the history of the facial fracture should have been investigated. The investigation should have revealed the date and type of injuries. The place, hospital, evaluation and follow up care. Such information as this should have been ascertained ASAP.

*Id.*[6]

Dr. Benton's grievance response does not establish a triable issue of fact. The Court notes as a preliminary matter that Dr. Benton's recommendations were consistent with Plaintiff's treatment. On the day Plaintiff entered SRJ, Defendant Magat requested information from ValleyCare, and Defendants Beltran and Melgarejo saw Plaintiff and scheduled follow-up care. Indeed, Plaintiff was evaluated and treated as early as February 13, 2014 while still at FCI. Plaintiff appears to construe the grievance response as evidence that Defendants should have expedited his referral to a specialist. However, the declaration of Defendants' expert, Dr. Connelly, sets forth his professional opinion that Defendants did not breach the standard of care by not immediately transporting Plaintiff to a hospital or specialist. Connelly Decl., ¶¶ 24, 26, 28-32. Plaintiff therefore establishes nothing more than a difference of opinion as to treatment, which, as a matter of law, is not enough to establish an Eighth Amendment violation. *Jackson*, 90 F.3d at 332. Even assuming that Dr. Benton's response is evidence of a standard of care that was somehow not met, the record at most reflects negligence, which likewise is not enough to establish

---

[5] Plaintiff argues that it was inappropriate for Defendant Cerise to order x-rays before referring him to a specialist because the x-rays from ValleyCare had already been obtained by Defendant Magat before clearing Plaintiff for admission to SRJ on February 14, 2014. However, the record is undeveloped as to what documents, if any, Defendant Magat received from ValleyCare on February 14.

[6] Dr. Benton's response is undated, but Plaintiff received his final inmate grievance response from the Alameda County investigating supervisor on May 21, 2014. *See* Pl.'s Decl., Dkt. 58, Ex. 3.

11

an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835.

### 2. Pain Medication

Plaintiff also argues that his pain went unmedicated for long periods of time. The record shows that the only significant delay in Plaintiff's receipt of pain medication while under Defendants' care was the eight-day gap between Plaintiff's February 18, 2014 medical slip request for pain medication and the renewal of his Norco prescription by Defendant Cerise on February 26, 2014. Defendants have submitted evidence that they tried to see Plaintiff on at least two occasions during this period. *See* Magat Decl. Ex. 1 at 131. The parties dispute the reasons these attempts were unsuccessful, i.e., Defendants assert that Plaintiff was off-site during his scheduled appointments while Plaintiff denies being off-site. Regardless of the reasons, there is no evidence that any Defendant deliberately caused a delay in plaintiff's care and/or pain treatment during this time, let alone that they did so in disregard of a perceived "substantial risk of serious harm." *Farmer*, 511 U.S. at 837.

Instead the undisputed evidence shows that Defendants Beltran and Melgarejo gave Plaintiff pain medication and issued a request for prompt follow-up during their evaluation of Plaintiff on February 14, 2014 and that Defendant Sadri, on February 24, 2014, issued a request for Plaintiff's medication request to be assessed at the next available appointment due to her inability to personally prescribe medication. Plaintiff offers no evidence to the contrary and fails to connect any other Defendant to the purported denial of pain treatment. *See Toguchi v. Chung*, 391 F.3d 1051, 1057 n.4 (9th Cir. 2004) (affirming summary judgment when plaintiffs had not demonstrated a genuine dispute "regarding the obviousness of any of the risks [the defendant] allegedly ignored"); *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (2002) (affirming summary judgment when plaintiff had not shown officers "must have known" of risk of harm).

In sum, Plaintiff has failed to raise a triable issue of fact that the care he received at the hands of Defendants amounted to deliberate indifference to Plaintiff's serious medical needs. Accordingly, Defendants are entitled to summary judgment as a matter of law. *See Celotex*, 477 U.S. at 323.

//

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

The Clerk shall enter judgment for Defendants and close the file.

This order terminates Docket No. 47.

**IT IS SO ORDERED.**

Dated:  2/17/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge